The first case this morning is Von Duprin v. Major Holdings and Ms. Krahulik, I guess. Good morning, Your Honor. Good morning. You may proceed. May it please the Court. I'm Angela Krahulik with Ice Miller in Indianapolis. I represent Major Holdings and Major Tool and Machine. I'm going to refer to them both as Major today for the Court's reference. Major didn't cause or contribute to any of the contamination that's at issue in this case. Major is party to this case solely based on its current ownership and operation of its business on three of the four parcels that are at issue. It came to those parcels years after hazardous substances were released there by others. Ms. Krahulik, where are those parcels actually? What physical city or town or whatever? So they're located in Indianapolis along 16th, north of 16th Street and east of Andrew J. Brown Avenue. Major Tool has an entire campus there, which includes these three parcels. It also owns a couple of parcels to the east of the areas we're talking about. It has expanded its operations over the years to acquire the other three parcels. Thank you. After it acquired the parcels, and in particular the Ertl parcel, Major Tool worked with the City of Indianapolis to redevelop those parcels, and it has built a world-class manufacturing facility there. It's really kind of amazing what it looked like before and what it looks like now. It first leased the property, the Ertl property from the city, and in its agreement with the city, it not only agreed to build this facility at an expenditure of about $20 million, but it also agreed to provide certain jobs, and those jobs were to be provided at a certain wage. So it not only cleaned up the properties, it put them back to good use. And while it undertook all of these activities, it also worked with the City of Indianapolis to make sure that it was able to protect itself from liability. It performed phase one environmental site assessments on the properties it acquired, and, as I said, it worked to clean up the contamination caused by others participating in or funding the excavation of about 50,000 tons of soil from the three properties combined. However, the district court found that MAJOR did not satisfy the all-appropriate inquiries requirements for two of those three properties. That was the Ertl property and the Zimmer property. The district court found that MAJOR was a BFPP for the Moran property. And then to add insult to injury, the district court awarded Von Duprin damages under CERCLA, despite the fact that Von Duprin failed to show the nature of many of its costs, and despite Von Duprin's failure to comply with multiple provisions of the National Contingency Plan as required for recovery under CERCLA. And then further on the subject of damages, the district court committed an error in failing to assign Zimmer, who's a party to this case but not before you today, because they failed to appear or respond and were defaulted in the case. A default judgment was then entered against them. Was there a judgment entered? Yes, the court's findings of fact and conclusions of law at the at the conclusion of the bench trial said that it could not assign liability to Zimmer because there were not facts in the record to allow it to do so. And by operation of law, there were facts, and we believe that the court's decision in that regard was an error. Because of the default entered against Zimmer, the allegations pled against Zimmer were taken as true. Those allegations included all of the requisite elements for CERCLA liability. So we believe the court's error was in finding that there was not record evidence in front of it to allow it to apportion any liability to Zimmer in its decision. But there was no actual judgment entered, though. Nothing titled as such. The findings of fact and conclusions of law did actually address Zimmer's liability. I understand that, but there is a formal judgment requirement, right? The court entered the 55A default in 2017 and then addressed it in the findings of fact. It did not enter a separate Rule 55B judgment against Zimmer. Now, as to the images, the court found both at the summary judgment stage and after the bench trial that the harm in this case was divisible, but it failed to apportion that harm, which is the second step in the divisibility analysis amongst the parties. Instead, it skipped straight to allocation, which is an equitable analysis, and that's apparent in the court's findings and conclusions because it uses those terms interchangeably, and in fact, under the paragraph that it entitled apportionment, it conducted no analysis of apportionment as required in that two-step divisibility analysis. And the apportionment is important because that is actually guided by principles of causation. It's not divided by or guided by equity as allocation is. So, the failure of the court to apportion the damages is also a significant issue for Major. Ms. Krahulik? Yes. Can I back you up just one step in the point that you were just making and ask whether are you convinced that the district court complied with the standard for finding that liability was divisible in the first instance? Yes, we do believe that the district court complied with the standard in finding divisibility. There are multiple bases upon which a court can determine that a harm is divisible. There was evidence in the record before the court as to divisibility, both from Major's expert, Rob Walker, who offered a divisibility opinion based on the contributions of the parties to the contamination and based on Adam Love, Moran's expert witness's testimony, and he testified regarding distinct geographic areas of contamination, non-contiguous areas. The Hercules case talks about that type of divisibility analysis. And he determined percentages of liability and recommended those to the court based on the geographic areas of the releases. Well, sure. But my expectation is that Von Duprin is going to say, well, we have an expert that offered a counterpoint on all of that. And the presumption in this area is that liability is joint and several, not divisible, not subject to apportionment, correct? That is the presumption. Of course, it is rebuttable. And that evidence was before the district court. And in fact, Von Duprin did not offer an opinion as to divisibility. It rested on the argument that the harm here was joint and several. So the only opinions before the court as to divisibility were those offered by the expert witnesses proffered by Major and Moran. Well, Ms. Gerhulic, following up on that line of questioning, we have our court's decision in NCR1, the initial decision where the opinion goes into some depth with regard to that first step of divisibility. Obviously, we are in the world here of Restatement 2nd towards 433A with its illustrations. As we look at this question, this particular question, some of those illustrations, 14 and 15, can look awfully close to the fact circumstances that are present in this case. Is your argument to us with regard to divisibility that is it a record argument based upon the two expert opinions and leave it at that? Or are you asking us to look behind that and look a little deeper? And if we do look a little deeper, where would that leave us on that first step of the divisibility question? Well, and as you know, that step looks at whether there is a theoretical basis for dividing the harm amongst the parties. And we do believe that those expert witnesses' testimony provide that theoretical basis. And even if the court is to look— What does the word theoretical mean in that context? Is there— I'll tell you why I'm worried about that. I'm worried about that because I think there's a risk that there's no question that the district court latched on to the term theoretical. We use that term, of course, in our 2nd NCR opinion. I'm not at all sure that it grounds itself in Burlington Northern, though. And so what I'm wondering about is if theoretical means that you can approach the question of divisibility at a high level of generality. I'm not sure that that makes sense. What's the legal content of theoretical? Well, I think it is looking at whether the evidence provided a basis. And I don't necessarily think it has to be, at least in this case, looking at the facts from a high level. The testimony was specific and based on a scientific analysis. So at least as far as Moran's expert's testimony on divisibility, it was more than theoretical. It was concrete. He performed analysis of sampling data at the four different properties over the course of many years and then created a data set and a model. And I'm using the word model loosely here, but he created a data set. And then the output of that was the percentages of liability that he offered to the court as far as the divisibility. He does. But Dr. Love, before he gets into that, recognizes the difficulty with trying to apportion liability because of the passage of time, because of the removal of soil, because of the commingling, and all of that. The reason that he then offers an opinion, of course, is because he was retained to do so. And so he draws upon his expertise and he does the best that he can that way. But what I don't know is if the best that he could do is enough to get you out from under the presumption that liability is not divisible. I believe it was. And certainly, you know, this type of case isn't one of the cases, and I've reviewed many of them, where courts found that there was no basis for divisibility where discharges were made, for example, into a body of water where they commingled. But here you do have the separate areas of release. There are also, according to Dr. Love, differences in the constituents of concern being TCE up gradient and PCE down gradient. And so I think the court did have, based on both the geographic areas of release and those chemical differences, basis to divide the liability here. And even regardless of the divisibility analysis, we believe that the court should have given Major Tool no liability based on the fact that it was a bona fide prospective purchaser of not only the Moran property, as the court found, but also of the Zimmer and Erdl properties. The Erdl property is particularly interesting because it's undisputed by any of the parties and recognized by the court that Major satisfied all the requirements of a BFPP when it acquired the property in 2013. It performed a phase one assessment in January of 2013 and then took title later in January of 13. So as to the regulations, it complied with the letter of the regulations, but the court, the district court here, went on to put a secondary requirement on Major that not only did it need to do that before acquisition of the property, that back when it leased the property from the city, it also needed to qualify as a BFPP and perform a phase one at that time. Now, Major did so just because the Erdl property was so impacted, but that phase one wasn't updated within the time period necessary. So it certainly did those things, but what is interesting is that the CERCLA regulations allowing for tenant protections as a BFPP didn't even come into existence until 2018. So in 2013, when this phase one was performed, it satisfied, checked off every box that it could to protect itself from liability, just like the liability in this case. And it not only did that, it sought a Department of Environmental Management. And that comfort letter didn't evidence its BFPP status, but said in item's opinion at that time, it had satisfied all appropriate inquiry and would qualify as a BFPP. Item then ordered that the Erdl property be closed. It said the property posed no further threat to the human health or to the environment, told the consultant to remove any monitoring wells. And essentially everyone went on their way thinking that everything they'd done, you know, that could be done had been done. And this is significant because if parties can't provide for their own protection by performing a phase one and, you know, doing all the right things, even getting a comfort letter thereafter, then the purposes of CERCLA are not being served. And those purposes, as stated by Congress, were to encourage the redevelopment of brownfields. And in particular, that's the purpose of the BFPP liability exemption. Similarly, on the Zimmer property, the court found that Major was not a BFPP by imposing additional requirements not found in the regulations. At the time, the phase one for the regulations said that, and these are the AAI final rule as promulgated, it said there's two options to satisfy AAI. You can either show that you satisfied every section of the federal regulation individually, or you can show that you satisfied the ASTM standard in existence at the phase one for the Zimmer property that Major commissioned had all of the boxes for ASTM 1527 checked off. And despite that, the court then said, well, you not only have to satisfy those, you have two more regulations in the CFR that you have to satisfy. And we submit that didn't comply with what the AAI final rule said. And the court should have found Major a BFPP for the Zimmer property. Again, the district court's finding is allowed to stand would have negative implications, not just for Major, but for any other property purchaser during that time who relied on a phase one environmental assessment in deciding to acquire and redevelop a brownfield. It looks like I'm out of time. Oh, no, I'm not. You have seven minutes, eight minutes. Yes, I reserved eight minutes for rebuttal. So I will just quickly want to address one other thing. The NCP compliance issue, there were multiple provisions of the NCP that the court found that Von Duprin did not comply with, yet somehow the court found that Von Duprin substantially complied with the NCP. We submit that what it did was not enough to show substantial compliance and that it should not have been awarded its past costs based on substantial compliance with the NCP. The court specifically found four provisions of the NCP that weren't complied with, and Major pointed out several others that Von Duprin had not complied with in asserting that its costs were recoverable under CERCLA. And I'm going to save the rest of my time for rebuttal. Thank you, Mr. Krueger. Thank you. Counsel? Your Honor, I believe next would be the Okay. Thank you. My name is Glenn Bowman, Stolkeen and Ogden, Indianapolis office. I am counsel for Moran Electric Service. Let me go right to the issues of explanation of the Dr. Love report and be clear about what he did do and what he didn't have to do. And I do believe the district court, I'm looking at the opinion and I won't recite it at length, but the opinion in this short appendix at 72, the court notes that the case involving a single harm, nonetheless divisible because it is possible to discern the degree to which different parties contributed to the damages, citing Berkeleys. She then notes after days of trial that what Dr. Love was able to do, he relied upon a database that had at least 30 reports. The point of this is you've got four environmental sites with the environmental investigations and remediations going back many, many years. The database was robust. A database had thousands of individual data points. There really is a dispute, I don't believe, that there are four distinct areas of impact on the distinct areas in which there are shallow soil impacts. What he was able to do with that, and we spent a lot of time at trial on this, and this is where the theoretical becomes reasonable and it's the facts and it's the science. We spent lots of time looking at the degree to which shallow soil impacts on Moran versus Zimmer versus Erdl and Von Duprin were able to be used to calculate mass. You can do that. You don't have to know the volume. You don't have to know the time. As the chlorinated solvents go into the ground, some absorb to soils. Others can go to groundwater. He was able to use those shallow soil impacts to determine contribution to mass. It's understanding at the common sense level and it's understanding at the science. If you're trying to figure out who contributed what, the shallow soil impacts with chlorinated teach you so much. He was able to do that. To be clear about what Dr. Love did, the upgrading of sources that we talked about, which is my client Moran, Zimmer, and Erdl, he allocated that based upon those shallow soil numbers. I'll get to why he used those shallow soil. For purposes of allocation between the upgradient and Von Duprin, he used every single groundwater data point ever created, thousands of them. As he looked at it, the testimony which the court cites that was at trial and candidly is uncontroverted. We feel Dr. Love's effort on apportionment, understanding that Ms. Krahulik believes that Rob Walker addressed that. We think that Love was the only one that looked at it. This was really key testimony. I think the court ought to look at that. When Dr. Love was looking at the groundwater concentrations, he found the following. When you look at the groundwater concentration and how they change as you move from upgrading it to downgrading, right at the upgrading boundary of Von Duprin property, both the magnitude of the concentration as well as the chemical constituents change dramatically. The concentrations go up by a factor of five and the concentrations change from TCE dominated to PCE dominated. This court has dealt with these kinds of cases before, I'm certain, but PCE is perchloroethylene, TCE is trichloroethylene. While they're both chlorinated solvents, that is a very significant fingerprint. Perchloroethylene has four chlorine molecules, trichloroethylene has three. It is a fingerprint that can be used to distinguish. He was able to do that here. Not only that, and Dr. Love has a lot of experience in this judge. I believe I demanded integrity of him. I believe he had integrity. We need that truth. He had looked at these kinds of situations before. Whether the TCE, it's PCE and groundwater, the toxicity is similar. In chlorinated sites, if you're doing a mass contribution, you don't have to, from the standpoint of allocation of harm, divide TCE from PCE. He's able to do a harm and mass contribution based on that, but the fingerprint can be used to determine contribution. In trying to decide how this is a case where... Can I ask you a question at this point? Yes. Maybe the question reflects some confusion on my part. What I'm hearing you to say is, first and foremost, Dr. Love is reliable. He should have never been stricken. And second, or his opinion should be relied upon entirely. And then second, that his analysis was sufficient to support the post-trial findings. Is that fair? Yeah, absolutely. So what I'm trying to do, what I'm still hung up on though, is did the district court do enough factually to determine that the presumption of joint and liability should not apply and that liability should be divisible here? Because everything you're talking about is very fact, very evidence intensive. You're drawing upon the trial record. But when you look at the summary judgment opinion, it was the basis for determining that liability would be divisible. There's not a whole lot there. Well, what was submitted at that time was his report, was a subsequent affidavit for his trial testimony wasn't any different. The analysis provided to the court as part of summary judgment. And we had this sort of combined Dauber challenge and summary judgment all at the same time. And candidly, Dr. Love survived the Dauber challenge, I think appropriately because of the kind of analysis he did. And then following that, she relied upon it for summary judgment to find that it was divisible. There was a deposition of Dr. Love that was available at that time. It was very heavily vetted. And it is fact sensitive and it is science sensitive. When Von Duprin responds by saying, hold on, hold on, there's been a lot of time passed, there's been a lot of soil removed. Not all this stuff is as fungible as he may think it is, or I mean, as traceable as he may think it is. The district court responds by saying, hey, those are just those are just practical problems. We're trying to figure this out at a theoretical level. And that's what I don't know what that means to try to figure out whether liability is joint in several or divisible at a theoretical level. Well, as I understand the law, there has to be a reasonable basis. And that's what I believe the target is. And I think we more than hit it. There's a reasonable basis based on the facts and the science. That's what we're held to. Mr. Bowman, you're taking that from the Pocutis case, this reasonable basis. Because Pocutis talks about it doesn't have to be absolute certainty, but it's got to be above a certain level. And then they do a very deep dive into the facts. And Pocutis, there's these three theories the expert had. Ultimately, though, the court rejects this conclusion that divisibility, if I'm reading this correctly, that divisibility is appropriate here, because the court did not find a reasonable basis. But that's where you're taking the standard from. Is that correct? You're right. Absolutely. And maybe this helps. If not, this will only take me 15 seconds, and you can cut me off. But having practiced in this area a lot, here are some of the challenges that weren't in the record. These were some that we didn't have. What if the parties had operated degreasing operations on the same properties at the same time? In other words, Moran degreased on Erdl, or Erdl degreased on Moran? No. We had three or four distinct areas where parties remained loyal to their properties. We didn't have that. You probably faced cases where you have multiple operators on the same property. We didn't have that. What if the parties used the exact same constituent of concern? We didn't have that. The up-gradient property used TCE, down-gradient used PCE. What if the degreasing operations were so close that these shallow soil impacts actually touched each other? Well, that would be a tough factual situation. We didn't have that. These are four distinct areas. And here's the interesting one. When people talk about the rare case, what if the up-gradient property owners used PCE and the down-gradient property owners used TCE? That or Von Duprin used TCE. PCE can transition to TCE, and that would have been a challenge. I mean, you would have to model. We didn't have that. We had up-gradient property owners with TCE, three molecules, down-gradient, four molecules. It worked. Perhaps it is rare, but as I've dealt with this defense for so many years, I don't think I'm playing the lottery. I think I'm finding facts and science that work. And I do think we have facts and science that work. Four distinct areas, three molecules up, four molecules down. And as Dr. Love stated, very, very distinct changes in contaminants along the property line between Von Duprin and up-gradient. I think we're well beyond theoretical. Thank you. Mr. Cranley? Yes, Your Honor. Good morning, Your Honor and Your Honors, and may it please the Court. I am Mark Cranley. I represent the Affili Cross Appellant, Von Duprin LLC. And I want to start by focusing on what exactly is going on in this case. This is a situation where one of several entities that own property up-gradient from an area where there was a groundwater plume took the initiative to go out and remedy that situation. Only one entity, my client, did so. We work very closely with the Indiana Department of Environmental Management, the regulatory body here in the state. And what we're trying to overcome now aren't evidence issues regarding whether there is, in fact, a discharge, whether there is a problem, or whether our costs are reasonable. What we're seeing is obstacles placed for the other side to play their fair share. And really where I think we start in considering the fair share is the issue we've been discussing this morning regarding divisibility. Divisibility, from our viewpoint, has to focus, and frankly from the Supreme Court's instructions in Burlington, has to focus on not where the TCE came from or what geographic spots within the relative property at issue where it stemmed from. The question is harm. Is the actual harm caused by the parties divisible? No one has talked to you about that yet today. What you've heard is discussion about where these in the past, and you can go back and do history on that. But that's not the question that would go into the divisibility analysis. It starts with the question of whether it's even possible to take this harm and separate it into its component parts, not whether you can look at different properties and how much they discharge. The way I look at this is if you had four people at a table and they toasted their red wine glasses, and each of the red wine glasses spilled when it was a white tablecloth and made a stain. You can't go back and pick apart how much of each person's wine got on there. It's irrelevant. There's a stain. Everybody contributed to that stain. That's what happened here. Each of these properties, and regardless of whether Major actually discharged the TCE, they're an owner of the property, and we'll get to that in a little bit more detail in a bit, but each of these properties discharged TCE. We don't know basic questions about that, such as the volume, the speed of the transfer, when they occurred. We're talking decades of time in which this occurred and then trying to make estimates back, but we do know it created a groundwater plume. Moran wants to talk about soil samples being taken, but the question isn't soil. It's groundwater. It's a groundwater plume three-quarters of a mile long underneath houses in a city park that's pushing TCE vapor up. All of these parties, including my client, has a share in discharging TCE molecules, but you can't go back and trace whose TCE molecules are causing the vapor to push up into any individual's home or into the park. You can't separate it out. It's a commingled plume, and what you haven't been cited by either of our opposing parties, respectfully, is a case showing where this kind of commingled plume that's causing injury, a single injury, to the downstream residents is something that can be even theoretically, let alone possibly, divided. I think the real language is out of Burlington, and it's, is this even possible division? And the question there is because the courts want to have a gatekeeping function. Supreme Court gave us, Your Honors, and the district court a gatekeeping function, and before we get into this expert analysis of expert A saying this and expert B saying that, we want the courts to look whether the harm at issue, regardless of how it got there, is the harm at issue itself capable of being divided. And in this case, with a commingled plume causing a single injury to 40-some houses in a city park downgrading, I bet it's not theoretically or possibly divisible, regardless of what standard applies. I don't think this is necessarily the case, but that has to be resolved because it can't even be divided theoretically. Once the white line's on the tablecloth, it's there. We all have to clean it. Under the second issue on our cross-appeal is the BFPP defense, and then it's also part of Mr. Hulick's appeal regarding the properties where that was denied. The primary argument that's presented to Your Honors is a retroactivity argument, which from our vantage point, as we elucidated in the brief, wasn't presented below. It was presented for the first time on appeal, and can be rejected on that ground. But beyond that, this argument that the rules for leases did not apply in 2002, 2003, and you can't retroactively apply, it's simply false. It's false on the fact, the law, excuse me. If you look at Public Law 107-118, this is the act that Congress passed back in 2002 to create the bona fide prospective purchaser defense. It has been revised, and Mr. Hulick's right about that, but the original language said an owner or a tenant has to meet these requirements. And Hercline was surely a tenant at that point. They were signed a lease after this provision was in place. And because they were a tenant, to be a BFPP at that time, they would have needed to go through all the requirements. And I frankly acknowledge Ms. Kuhila Kander admitting here now that we're on appeal, that they cannot meet the AAI standard, the All Appropriate Inquiry standard, for their property, if we look any time period earlier than 2013, in which she acknowledges. So essentially, you don't get a second bite at the apple. What happened with the two major properties, the Ertl property and the Zimmer property, they initially had a lease after 2002 when this provision said that you can't be an owner or a tenant. They were a tenant as a leasing party. They didn't meet the AAI standard, so they shouldn't have been a BFPP. That fact doesn't get washed away by the fact that they later decided to purchase the property. And they're purchased the property and met the AAI standards at that time. But that's irrelevant. At that point, they are a liable party under CERCLA. And they can't wash that clean by looking back in, or I'm sorry, can't wash that clean by later saying that we satisfied the BFPP requirement at this later point in time. The fox is already in the henhouse by that point. The other, your honors don't have to even get into this retroactivity analysis because MAJOR can't satisfy the BFPP requirement even without regard to the AAI standard. As we've stated out in the briefs, there's essentially two categories of BFPP issues. One's the all-appropriate inquiries. But once you've done inquiries and purchased the property, you still have to take action to protect your interest in it. And one of those ways is to ensure that there are no further discharges, address discharges that are there. The facts on this were really undisputed at trial. They were, showed that MAJOR did nothing. They didn't take action to remedy, prevent future discharges. In fact, they didn't do anything until shortly before trial. Now, the district court didn't go so far as to address these. It addressed the AAI issues and correctly found that they had not met the all-appropriate inquiries. But your honors can affirm on any ground. If there was any basis to this AAI argument, the order should be affirmed based on the fact that they couldn't meet any of the remaining requirements for the BFPP defense, including the fact that they did nothing to remedy this. On the MAJOR, I'm sorry, the Zimmer property, this is the one BFPP defense we're appealing, the district court said that not all-appropriate inquiries were made. But again, we get back to the argument I just made. We can put a pin in the all-appropriate inquiries and look to the other requirements of the BFPP and that the Zimmer paper doesn't, the Zimmer property doesn't satisfy those either. There was no follow-up, there was no attempt to prevent further spills, and there's no BFPP defense. But even on the all-appropriate inquiries, MAJOR's argument is essentially that we came close enough and we should be excused from that. And that's not the way this rule works. Congress has shown that it is capable of applying a substantial compliance rule under CERCLA when it so chooses, and so does the EPA. The example I would give is the issue I'm going to hit next, which is the National Contingency Plan. There is actually baked into that part of the requirement a substantial compliance standard. There is no such thing when it comes to the BFPP defense, and logically there isn't. CERCLA is a broad remedial statute. It's intended to go back and allow people in my client's position to find remedies for cleaning up properties. It's to carry out the congressional purpose of ensuring that polluted properties are fixed. The BFPP is an exception to that, and because it's a carve-out to the otherwise standing liability under CERCLA, it's going to be a little bit of a higher bar. And you have to meet the actual standards, or you're not going to get that protection. And so close enough doesn't count. And the only case that's cited to you is a district court opinion out of South Carolina that didn't even say what MAJOR tells you it says. It said that there might have been some inconsistencies in the paperwork. We don't have inconsistencies. We have failure to meet the standards. For instance, the Phase 1 for the Zimmer paper property didn't even have the questionnaire that was required to be filled out as part of the Phase 1 survey. So basic information given from the client. It wasn't even the right client. It was the wrong entity. So you can't take someone else's Phase 1 and rely on it. And it didn't have the certification from an environmental professional that's required. On the National Contingency Program arguments, again, this is an area. We're here after a bench trial. I think we've all recognized that today. And the facts related to this were all found by the district court. As to the level of compliance with the NCP, this was an issue battled out between the experts. We had Mr. Williams on our side, Mr. Hockannon on Ms. Krulik's side. And the judge, in her fact-finding, picked the winner there. She said Mr. Williams was right. But again, the court doesn't need to wade into that. There's a simpler and more straightforward means to address this issue, which is that in the court's NutraSuite decision and in other cases around the Seventh Circuit that have applied that decision have all held that complying with and working with the pertinent state agency that carries out regulation is going to satisfy the NCP requirements, at least the remedial NCP requirements. The investigative requirements are presumed to be appropriate and compliant. And there's no dispute here that my client worked very closely with IDEM. We followed IDEM's requirements. We communicated with IDEM. We filed into the IDEM's voluntary compliance program by our choice. We even had IDEM testify at trial. The program coordinator for our project came and testified on the stand and said we did coordinate with them. We got their approval. Our remediation work plan was approved by them. I think that's an incredibly telling fact that the regulator was willing to come in the court to testify to this fact. It's impossible for us to see how, under a clear error standard, the district court judge could have possibly be reversed on that ground given that statement. Mr. Cranley, can I ask you a question about a different aspect of the case? Yes, Your Honor, please. It sounds like you might be at a pivot point there. Where do you believe in the district court's post-trial opinion the court apportioned liability? Where can we look in the district court opinion to see what the results of the apportionment were? I would be the first person to tell you it's cloudy, Your Honor. It could be done with more precision. But if you go into her order, she has two different sections where she refers to apportionment on page 29 of her order, and on page 30 of her order, she moves on to allocation. It's very clear how she does this. She apportions based on what she had found in the summary judgment. And it probably would be helpful if we had more of the summary judgment order reproduced within this. And then she allocates based upon... No, no, no. Hold on. Hold on. I it's capable of being apportioned based upon the summary judgment. But capability of being apportioned and then actually apportioning liability... Because apportioning liability, it seems to me, is statutorily required in a cost recovery action where you've determined that liability is divisible. I know you disagree that it's divisible. I got that part of it. But if you determine that liability is divisible and it needs to be apportioned, you're not asking the question, is it capable of being apportioned? You then actually have to apportion it. Right, Your Honor. I see where you're coming from. And I think what's confusing here is that the wrong word was used in the order. Here we have two similar words that mean similar things in a very specific context. But if you go to page 30, I believe it's 31, yes, of her order, she says that each of the properties is allocated a certain amount and then reduces or increases based on equitable factors. The first step of those, she says it's allocation, but it's really apportionment. And that's where the confusion lies. I mean, if anything, it's something that perhaps could have been cleaned up with a non-protonic entry. But at the end of the day, that's what's happening there. She's apportioning a certain percentage to each property and then takes the next step to look, which you can't consider equity, you have to consider only causation. She does that there. So your point is, I want to make sure I got this. You're saying the apportionment occurs on page 32 of her opinion with the percentages that attach to the properties? It's 31 of the opinion, but yes, that's the part I'm discussing, Your Honor. So each property is apportioned a certain amount of the causation. And then she goes from there to each defendant and allocates a certain percentage of liability for that property. And is this where you jump off to your argument, Mr. Cranley, asking us to focus on harm rather than cause? That's definitely part of it, Your Honor. The thing that's supposed to be divided or appropriated is the part of the harm. So we look to, can this particular harm be sliced up amongst individual sources? And here we would say no, because again, we have the Weinstein. We have a three-quarter mile long plume that's been commingled over a long period of time and we just can't isolate the TCE molecules given the amount of time and the amount of changes and all the variables we just don't know. And I respect Mr. Bowman's candor on that. There's a lot we don't know here. And I would agree with that. And we just can't slice all that up. But even theoretically, you can't look at this one single commingled plume and say that this is something that can be divided amongst defendants. It's a single injury caused by multiple defendants, much like the examples given in the restatement provision. Mr. Cranley, let me ask my question slightly differently, which will expose my confusion and maybe you can clarify it or Ms. Krahula can. When I read the post-trial opinion and focusing on the pages that you're concentrated on, I can't figure out what liability was apportioned, how it was apportioned, and how from there liability was allocated based upon the equitable factors in accordance with what Section 113F requires. It all seems to me to be meshed together where terms like apportionment and allocation which I've learned from preparing for this case are in no way synonymous, okay, are effectively deemed synonymous. So why am I making that observation? I'm making that observation because my question is how do you conduct judicial review of this? How can I figure out where liability was apportioned and whether that reflects a legal or factual error? And then separately, how can you conduct judicial review of the 113F contribution or allocation analysis? What do you look at here? Both of those are done based on the findings that the judge made and what the facts were. I got that part of it, but can you tell me where? If you said if you want to conduct judicial review of apportionment, this is what you should focus on. And then if you want to review the allocation based upon an application of the equitable factors, here's what you ought to focus on because I can't figure that out. Your Honor, I would say that whether the factors were applied in this specific section or facts found earlier, she does make both the apportionment and allocation. If you look, for instance, on page 31, it says Moran. I'll use Moran as an example. Mr. Bone will forgive me. Moran is allocated 75% of the 25% share attributable to the Moran site. So what she's saying there is that the Moran site is apportioned 25% of the part. That's a description of Von Duprin's argument. Look at the way that starts. Von Duprin suggests, etc. He proffers, meaning the expert. Is that because there's other, in other words, these paragraphs are descriptive of the positions the parties were taking. Where are the court's findings? And what spikes that home is she's telling us the evidence and what the different provisions are for that and then adopts them in her final judgment below on page 33 where she walks through each of those properties and says, for instance, the Von Duprin property is apportioned 50% of the total harm and responsible for 100% of that harm. Okay, where does the allocation occur then? The allocation would be the 100%. She took no reduction for equitable consideration. But apportioned 50% of the total harm to Von Duprin. So we got 50% of the Weinstein and we're all 100% allocated based on the equitable consideration. And I would be, again, Your Honor, I'd be the first to tell you this is not the most pellucid way of doing this. But there's no requirement that the judge separate these two into separate provisions. She's making a calculation because there's so many parties and so many properties. She's doing it by party and by property first, but doing the allocation and the appropriation together. Well, are you? Are you? Okay, so that's interesting the way you say that. Are you sure about that, that there's no need to separate? Because cost recovery under 107, as I understand it, is a distinct concept from contribution liability that's allocated under 113F. You can't just put it all in one hopper and mix it together. No, I agree with that, Your Honor. You have to do the 107 first. You have to determine that there actually is a divisibility and if there is an appropriation. The only way it's getting mixed in the hopper here is that instead of doing it first step, allocation, I'm sorry, appropriation, even I'm getting confused. Second step, here's the allocation for each party. She said it's better for me to think about this party by party or property by property and went down the list. I'm going to make here's, you know, you could disassemble this and show how each of the different parties is appropriated. You can add up the appropriation numbers and you get 100. And then you have an allocation done within those different properties. And it's consistent with the way the parties have presented the case, both in front of the trial court and here where we're thinking property to property because there's different issues and and of course, Your Honor, we don't even get into this. We find at the gatekeeping step that there was no potential divisibility here because we have a single commingled plume that caused a single injury. Mr. Cram, you're not disagreeing with the standard that I think Mr. Bowman was referencing with regard to reasonable basis, are you? I'm not, Your Honor. My position would be that given the nature of this plume that is so singular in nature that any of those standards would apply. I don't think the court necessarily has to reach that. I do agree that that's what the Ninth Circuit said and I think Your Honor pronounced it correctly and I'm going to butcher it, the Patoukas case. But really, the controlling standard is whether it's even capable of being divided under Burlington and we clearly don't have that here given the commingled nature of this plume. With that, Your Honor, I've reached the issues I intended to address and I'll concede the remainder of my time. Thank you, Mr. Cranley. Mr. Krug, you got to put your sound on. Thank you for the reminder. I didn't get too far. I think the confusion over the apportionment issue is completely understandable given the findings of fact and conclusions of law that we were given by the district court. It's clear from those findings and conclusions, at least to me, that the apportionment analysis that looks at causation was skipped by the court. That it certainly found a reasonable basis for divisibility but then went into the allocation analysis instead of first conducting the apportionment analysis as required by Section 107. And this kind of plays into that wine analogy. If the apportionment analysis is skipped, Major, who wasn't even present when this messy toast occurred, doesn't get the benefit of its absence because the apportionment analysis focuses on causation. But if you look at the BFPP defense that Major has asserted protects it and could end the court's inquiry and should end the court's inquiry as to Major. In fact, when Major did come in to the party where this messy toast was occurring, it was wearing a visqueen suit. It was protected. It did everything it should have done before it arrived to avoid the mess. Ms. Krahula, given that observation that you make, and I think the reason you say that is because you're just interpreting what the court wrote on page 30 of its opinion, where there's just no place that you can see where liability was apportioned or at least see it is, what's the consequence of that for us, in your view? I believe that the court could remand to the district court to allow the district court to appropriately consider causation and apportion liability in accordance with the statute. So the district court's ruling as to the theoretical divisibility would stand, but the only factor that is permissible, which is causation, and then the court could move into its equitable considerations under 113 as to allocation of the harm. I want to address a factual issue really quick. Mr. Cranley said that Von Duprin is the only one who took the initiative here, and that bothers me because Von Duprin took the initiative after it was sued by the then property owner of the downgrading property that it owns, and after IDEM came after it. Now, Major actually did take the initiative. When it acquired these properties, it worked with the regulators, it worked with the city, and participated in a massive cleanup. That also plays into what I believe is an absurd argument that Major did nothing to prevent future releases. It spent millions of dollars on these properties. The district court never brought up ongoing requirements for the properties as being an issue with Major's conduct. The only thing on the BFPP defense that the district court ever took issue with with Major was all appropriate inquiries, and it's not necessarily a retroactivity argument on Major's part with respect to the validity of its BFPP defenses. It is looking at the regulations that were in place at the time those studies were conducted, so they're not saying that this retroactive application is the issue. It's that they complied with the regulations at the time, and I would encourage the court to qualify or could qualify back in 2002 as a BFPP. The owner could qualify and protect its tenant, but it was still an owner who had to qualify as a BFPP under the regulation that existed. Mr. Cranley also mentioned that qualifying as a lessee couldn't be washed away by later qualifying as an owner. There's no authority cited on that, and Major, in fact, believes that that should be the case to comply with the stated purposes of surplus, which is to provide protections for people who purchased and redeveloped these properties. If tenants who didn't do a phase one, maybe they had no idea they were going to purchase property later, then could not cure when they wanted to acquire the property. You'd be encouraging people to abandon properties and not do the right thing and what surplus intended. Mr. Cranley mentioned Zimmer, but I think he was actually talking about Moran because he said Von Duprin is challenging the BFPP status granted by the district court on that property. We believe it was appropriately granted, and we would encourage the court to look at the Goodson case, which talks about the ability of parties to satisfy all appropriate inquiries, not only through a phase one, but through other means. And, you know, keeping in mind that at that time the standards in effect was the ASTM 1997 standard. And as to the NCP compliance issue, we believe the court ascribed testimony and opinions to Williams that he did not offer at trial. We quoted specifically in our briefing the line of questioning, and he did not offer the opinions that the court ascribed to him in its findings of fact and conclusions of law. In fact, he stated that certain information was not provided that the court then said was provided by Von Duprin as to its activities complying with the NCP. Overall, we believe the court should end its inquiry as to Major with its BFPP defenses. Those are very important statutory protections for purchasers of property who do the right thing, like Major did here, who do all the investigations and then put the property back into good use. It's important that courts recognize those, or we're going to see a chilling effect on people wanting to acquire properties like this. And turn them from these eyesores into producers of income and tax revenue. Thank you. Thanks to all counsel. Very nice job. And we'll move to the second case this morning. Thank you.